865 F.2d 257
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Curtis Lee CLARK, Petitioner-Appellant,
v.
Robert REDMAN, Respondent-Appellee.
 No. 86-2050.
 United States Court of Appeals, Sixth Circuit.
 Dec. 28, 1988.
 
 Before ENGEL, MERRITT and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Petitioner appeals the denial of his petition for writ of habeas corpus. The district court found that petitioner had not made a sufficient showing to establish ineffective assistance of counsel. We reverse.
 
 I.
 A.
 
 2
 Petitioner Curtis Lee Clark was convicted of first-degree murder in Detroit Recorder's Court on October 24, 1975, and sentenced to life imprisonment. The prosecution presented fifteen witnesses, only one of whom implicated petitioner. That witness, although questioned at the time of the murder, did not tell the police of petitioner's alleged involvement until almost one year later. Petitioner's court-appointed trial counsel presented no witnesses, relying on cross-examination of the prosecution witness to establish petitioner's defense.
 
 
 3
 On appeal to the Michigan Court of Appeals, the trial counsel's law partner was appointed counsel for the petitioner. Petitioner's conviction was affirmed and leave to appeal was denied by the Michigan Supreme Court. People v. Clark, 402 Mich. 817 (1977). Petitioner then sought a writ of habeas corpus in federal district court on grounds other than those raised here. The petition was denied and this court affirmed. Clark v. Anderson, 611 F.2d 371 (6th Cir.1979).
 
 
 4
 Petitioner then brought a motion for new trial in the state trial court, based on a claim of ineffective assistance of counsel.[1] He relied upon three instances in which his trial counsel was allegedly constitutionally deficient: counsel (1) failed to call petitioner to testify at trial in his own behalf;[2] (2) failed to investigate and interview a number of witnesses who would have provided petitioner with an alibi for the time of the murder; and (3) failed to investigate and interview a witness who would have directly contradicted the story told by the one prosecution witness who implicated petitioner in the murder. Following an evidentiary hearing in Detroit Recorder's Court, the motion for a new trial was denied. The Michigan Court of Appeals denied leave to appeal. The Michigan Supreme Court also denied leave to appeal. People v. Clark, 417 Mich. 1065 (1983).
 
 
 5
 A second petition for writ of habeas corpus was then filed in the federal district court for the Eastern District of Michigan, raising the ineffective assistance of counsel claim. Following an evidentiary hearing the magistrate issued a recommendation that the petition be denied. The district court adopted the magistrate's recommendation and petitioner now appeals.
 
 B.
 
 6
 The one prosecution witness who implicated petitioner in the murder, Judy Mahone, testified that Augustus Jackson-El, known as "Little Jack," was with petitioner on the night of the murder. At the time of petitioner's trial, Little Jack was in state prison on unrelated charges. Neither the prosecutor nor the defense counsel called Little Jack as a witness at the trial. In a deposition taken in preparation for the habeas corpus hearing, Little Jack testified that two police officers attempted to coerce him into testifying against petitioner to corroborate Judy Mahone's story. He refused to do so because her story was not true. Little Jack testified that on the night that he visited Judy Mahone, the night of the murder, petitioner was not with him.
 
 
 7
 Petitioner testified that he told his trial counsel about Little Jack and attempted to convince the attorney to interview him. However, counsel refused to do so, stating that Little Jack would not be a credible witness because he was in prison. Counsel testified that he could not recall whether petitioner mentioned Little Jack to him.
 
 
 8
 Petitioner's girlfriend at the time of the murder, Yvonne Hawkins Fair, testified at the evidentiary hearing that she and the petitioner were in Cleveland, Ohio on the day the murder took place in Detroit. Her testimony was corroborated by her sister, her father, and a neighbor of her family in Cleveland, all of whom testified that petitioner was with the girlfriend visiting her family in Cleveland at the time of the murder.
 
 
 9
 Petitioner testified that he informed counsel of the existence of the Cleveland witnesses. Counsel testified that he could remember little, if anything, about petitioner's trial and he had no recollection of anything concerning the Cleveland witnesses. He further testified that he could not locate his files on the case.
 
 
 10
 Petitioner submitted an affidavit from William Price, counsel's predecessor as petitioner's attorney, stating that he (Mr. Price) withdrew from his representation of petitioner because he was unable to go to Ohio to investigate witnesses on behalf of petitioner. However, there is no evidence in the record indicating whether petitioner's trial counsel knew the reason for Mr. Price's withdrawal.
 
 
 11
 At trial, petitioner made several pro se motions to the court to have his counsel removed from the case. At one point, he protested to the court, stating that "you hampered my defense by keeping me locked up and I can't find several of my witnesses." Petitioner did not, however, refer to the witnesses as "alibi" witnesses.
 
 
 12
 On the direct appeal of his conviction, petitioner was represented, as we have said, by his trial counsel's partner, although it is not clear that petitioner was aware at the time that the two appointed counsel were partners. Petitioner testified that he told his appellate counsel about the trial counsel's failure to interview and subpoena the alibi witnesses. The appellate counsel testified that he vaguely remembered something being said about an alibi defense, but, like trial counsel, had no firm recollection of petitioner's case, and he too could not locate his files.
 
 II.
 
 13
 Strickland v. Washington, 466 U.S. 668 (1984), sets out the two-prong test for evaluating claims of ineffective assistance of counsel, which is applicable to the instant case.
 
 
 14
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 15
 Id. at 687. In explaining the first prong of the test, the Supreme Court stated that "[t]he proper standard for attorney performance is that of reasonably effective assistance." Id. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. As to the second prong, the Court instructed that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. On review, findings of fact made by the district court are conclusive if not clearly erroneous. The performance and prejudice determinations, however, are questions of mixed law and fact and are therefore freely reviewable. Id. at 698.
 
 III.
 A.
 
 16
 There can be no question that the failure to reasonably investigate potentially exculpatory witnesses satisfies the deficiency prong of the Strickland test.
 
 
 17
 [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In an effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.
 
 
 18
 Strickland, 466 U.S. at 691.
 
 
 19
 In this case, if petitioner's trial counsel decided not to investigate Little Jack and the Cleveland alibi witnesses, it was unquestionably an unreasonable decision, even after "applying a heavy measure of deference" to his judgment, which unconstitutionally deprived petitioner of effective counsel. Little Jack would have directly impeached the credibility of Ms. Mahone, the sole prosecution witness against petitioner. No reasonably competent trial attorney would have failed at least to interview Little Jack to determine what he had to say and whether he would make a credible witness. Similarly, the Cleveland alibi witnesses, if believed, would have completely exonerated petitioner. No reasonably competent counsel would have failed at least to investigate their stories.
 
 
 20
 Nevertheless, the district court held that petitioner did not satisfy the first Strickland prong because he did not produce sufficient evidence that petitioner's trial counsel knew of the existence of either Little Jack or the Cleveland alibi witnesses. The district court concluded that there was "conflicting evidence as to whether petitioner actually told his trial attorney of the existence of alibi witnesses." The district court then listed four facts which it found mitigated against petitioner's claim that he told counsel about the witnesses: (1) if petitioner did mention it to counsel, he did so only a few days before trial and during the course of an altercation concerning the transcript; (2) petitioner did not mention the alibi defense although he did personally raise other objections to the court; (3) two of the alibi witnesses attended one day of the trial--the day the jury was selected; and (4) trial counsel testified that although he didn't remember whether he was told about the witnesses, if he had been informed of such witnesses, his normal practice would have been to investigate.
 
 
 21
 We fail to see how these four propositions create any "conflicting evidence as to whether petitioner actually told his trial attorney of the existence of alibi witnesses." The first fact cited as "conflicting" with petitioner's testimony does not conflict at all. The fact that petitioner informed counsel about the witnesses on the eve of trial during an altercation over the transcript may have indeed placed counsel in "an awkward position," as the district court found, but it did not relieve him of his duty to investigate the witnesses as part of his responsibility to provide petitioner with "reasonably effective assistance." Second, although he did not denominate them as "alibi" witnesses, petitioner did object to the trial court's "hampering" of his defense by preventing him from finding his witnesses. The district court's third "conflicting" fact, the appearance at trial of two of the alibi witnesses on the date of jury selection, has no bearing on the question whether petitioner told counsel of their existence. Finally, counsel's statement that his normal practice was to investigate potentially exculpatory witnesses is pure speculation. The question presented here is whether he knew about the witnesses in this case. His testimony is not probative on that issue because he stated that he could not remember.
 
 
 22
 Petitioner's testimony that he told counsel about the alibi witnesses is supported by the undisputed fact that he told counsel's predecessor, Mr. Price, about them. Moreover, counsel's successor as appellate counsel, his law partner, testified that he vaguely remembered some mention of an alibi defense. Because petitioner's testimony that he told his trial counsel about the witnesses is uncontradicted, because he unquestionably mentioned them to both Price and Solomon, and because no conceivable reason exists for him to have withheld this information from his counsel, we hold that petitioner has produced sufficient evidence that his trial counsel knew about the witnesses and failed to investigate them. We hold that the district court clearly erred in concluding otherwise. Counsel's representation was therefore constitutionally infirm.
 
 IV.
 
 23
 Besides showing that trial counsel's representation was deficient, petitioner must also establish that, but for the deficient representation, there is a reasonable probability the result would have been different. Strickland teaches that a reasonable probability is one which is "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In addition, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696.
 
 
 24
 The record in this case reveals that only one witness was able to connect petitioner with the murder. No other evidence was presented at trial which would link petitioner to murder. This is clearly not a case in which there is overwhelming support for the verdict. Had trial counsel investigated and presented the alibi witnesses at trial, there would have been several witnesses to contradict the one prosecution witness. Further, had trial counsel presented Little Jack, that one witness would have been directly impeached. At the very least, counsel's failure to investigate these exculpatory witnesses "undermines confidence in the outcome." It is reasonably probable that if these witnesses had testified at trial, petitioner would have been acquitted. For this reason, we hold that he has satisfied the prejudice prong of the Strickland test.
 
 IV.
 
 25
 Trial counsel's failure to investigate the alibi witnesses and Little Jack under the circumstances of this case, constituted constitutionally deficient representation and resulted in prejudice to the petitioner. Accordingly, the judgment of the district court is REVERSED. This case is REMANDED to the district court with instructions to issue the writ of habeas corpus.
 
 
 26
 ENGEL, Chief Judge, dissenting.
 
 
 27
 I respectfully dissent.
 
 
 28
 More than fifteen years ago, on November 17, 1973, the body of Lillie Mae Friday was found in a vacant apartment in Detroit. She had been tied up and her neck was slashed. While a missing person's report had been filed by one Judy Malone, the crime remained unsolved until October 1974 after petitioner Clark had been arrested for a different crime. At that time, Ms. Malone gave a statement to the Detroit police which implicated the petitioner in Friday's murder. Malone claimed that she had been instructed to make out a missing person's report by Clark, who telephoned Malone, stating that he had killed Friday and left her body in the nearby apartment of Jesse Howard.
 
 
 29
 While Ms. Malone was the only witness who testified specifically to Clark's involvement in the crime, her testimony was explicit. She testified that she first met Lillie Mae Friday on October 13, 1973 and that Friday lived with George Douglas, a boyfriend, in an apartment across the hall. Malone testified to an altercation between petitioner Clark and Lillie Friday, apparently attributable to Clark's belief that Friday had notified the police that Clark was an acquaintance of Douglas, who had earlier been arrested for murder: this provided the motive for Clark's murder of Lillie Mae Friday. Malone further testified that during the altercation, Clark went to get a gun but could not find one, returning later in the evening with a man called "Little Jack," later identified as Augustus Jackson-El. According to Malone, Clark left the apartment, leaving Jackson-El with Friday and Malone; Clark did not return until after midnight. Upon returning, Clark stayed for a few minutes then left with Friday. Later, according to Malone, Clark telephoned Malone saying that he had killed Friday and left her body at Jesse Howard's apartment. He directed Malone to make out a missing person's report for Friday; Malone followed these instructions, making the report on November 16 to Detroit Police Officer James Quarles. At that time, she did not claim any further knowledge of the offense, but in October 1974, after Clark had been arrested for a different crime, she gave a further statement which implicated petitioner in the murder. Clark was arrested for Lillie Mae Friday's murder on January 3, 1975 and was convicted on October 24, 1975 of first-degree murder following a trial in the Detroit Recorder's Court. He had counsel both at trial and on appeal. On April 22, 1977 the Michigan Court of Appeals affirmed. Petitioner then sought leave to appeal to the Michigan Supreme Court but leave was denied November 30, 1977, over three dissents (402 Mich. 817 (1977)). A pro se petition for writ of habeas corpus was then filed in federal court, denied by then District Judge Cornelia Kennedy on July 25, 1978, and affirmed on appeal by the Sixth Circuit in an unpublished order filed November 20, 1979. See 611 F.2d 371 (1979) (table).
 
 
 30
 Petitioner then returned to state court and raised an ineffective assistance of counsel claim for the first time. An evidentiary hearing on this claim was held on February 25, 1982 before Detroit Recorder's Court Judge Justin Ravitz, who had not presided at the original trial. After taking testimony, Judge Ravitz denied a delayed motion for a new trial. Subsequent attempts by petitioner to appeal to the Michigan Court of Appeals and the Michigan Supreme Court were unsuccessful. Thereafter, on November 30, 1983, petitioner Clark filed a second application for writ of habeas corpus in the United States District Court for the Eastern District of Michigan. Upon referral to the United States Magistrate Thomas A. Carlson, an evidentiary hearing was held to determine whether (1) Clark had, under Rule 9 of the rules governing section 2254 cases, abused the writ of habeas corpus and (2) if not, the merits of his ineffective assistance of counsel claim. Magistrate Carlson held a hearing on August 26, 1985 and also considered the separate deposition of Augustus Jackson-El, which was taken on October 2, 1985. In a twenty-nine page opinion, the magistrate recommended denial of the respondent's motion to dismiss under habeas Rule 9, but he also recommended denial of the writ of habeas corpus, concluding, "I do not believe that petitioner has shown that he was prejudiced under the Strickland test due either to trial counsel's failure to present witnesses for the defense or appellate counsel's failure to raise the ineffective assistance of counsel claim in the appeal as of right."
 
 
 31
 It is apparent from Magistrate Carlson's opinion that his conclusions were largely based upon an assessment of the credibility of the witnesses who were called upon to testify, including witnesses who petitioner now claims should have been interviewed and called by his original trial counsel, whose failure in this regard, he claims, amounted to ineffective assistance of counsel within the meaning of Strickland v. Washington, 466 U.S. 668 (1984). Magistrate Carlson also had before him the record of proceedings and conclusions of Judge Ravitz concerning the charge that petitioner's trial counsel was ineffective by failing to interview and call Augustus Jackson-El. Magistrate Carlson particularly agreed with Judge Ravitz's conclusion that petitioner had not been prejudiced by this latter omission:
 
 
 32
 The bottom line in terms of my analysis of Augustus Jackson's testimony is drawing, if you will, on the argument made by [the assistant prosecuting attorney], is that I'm not at all sure that Little Jack would have been a favorable witness to the Defense or that skillful and trained and competent criminal attorneys making an informed decision would have concluded that that issue ought to have been raised or that he ought to have been called.
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 Suffice it to say at this point, knowing what we know now, I don't think that any skilled trial lawyer would ever want to be in a position where he had to call as a witness Augustus Jackson, certainly not in a jury trial, and without belaboring the point, he certainly struck me as the sort of witness who offers very little in the way of credibility.
 
 
 36
 Carlson also concluded that Jackson-El "would not have made a credible witness and therefore the failure to call him did not prejudice petitioner."
 
 
 37
 On the question of whether petitioner's trial counsel provided ineffective assistance by failing to call alibi witnesses, both Judge Ravitz and Carlson agree that had the matter been called to the attention of trial counsel, it would have been prejudicial for counsel not to have investigated and interviewed those witnesses. If anything is uncertain in the record of this case, it is whether in fact petitioner did apprise trial counsel of the existence of alibi witnesses and of his desire to call them in his own behalf. While petitioner's own recollection seems to have gained considerable clarity during the passage of time, the testimony of the attorneys involved, including prior attorneys, trial counsel and subsequent appellate counsel, was not nearly so clear. Apparently the trial attorney's original notes had been destroyed when he was replaced by his former partner as appellate counsel. Trial counsel did testify, however, that if he had been told about the alibi he would have looked into it, a construction which Magistrate Carlson appears to have accepted as credible. Carlson also observed, however, that by petitioner's own admission, assuming such an admission was credible at all, Clark did not tell his counsel about these witnesses until a few days before trial. Carlson found that if petitioner had actually told Carlson, even though shortly before trial, the latter would still have been under a duty to request a continuance to give the required ten day notice of alibi required by Michigan law. See Mich.Comp. Laws Secs. 768.20, 768-21. Magistrate Carlson commented that of all Clark's purported alibi witnesses, only Yvonne Hawkins Fair had testified at the hearing before Judge Ravitz; her testimony was that her son had a birthday party on November 13, 1973 and that she and the petitioner went to Cleveland on the following day November 14, the day of the murder, and therefore could not have been in Detroit at the time of the murder. Judge Ravitz made the following assessment of Fair's credibility:
 
 
 38
 The trouble with the alibi testimony, in my judgment, and it's a very serious problem, is that I've have the benefit of hearing from one of the many claimed alibi witnesses, and Miss Hawkins certainly projected well, a lot better than other Defense witnesses. But her memory of the date and her ability to recall it is glaringly deficient to say the very least, and I'm not going to pick apart the testimony, but I think that the record is real clear that the quality of the claimed alibi proofs is wanting.
 
 
 39
 After hearing many more witnesses, Magistrate Carlson fully concurred with this evaluation:
 
 
 40
 The alibi testimony presented to me was simply not believeable. Petitioner himself never raised the matter with the trial judge (although he had raised other matters on his own) and both Ms. Fair and her sister, Ms. Burrell, were aware Petitioner was on trial (even attending some of the sessions) and never mentioned the alibi to counsel ... Fair could remember staying at her parent's home but not the particular motel in Akron ... (Motels, of course, keep records which private homes do not). The testimony before me by all of the alibi witnesses, now 12 years after the fact, was so remarkably consistent in all (even minor) details that it appeared clearly prepared and rehearsed. Furthermore, if the witnesses were mistaken by even one day, the alibi would have been broken.
 
 
 41
 With respect to the witnesses, Carlson ultimately concluded that "even if [attorney] Stern had interviewed the Ohio alibi witnesses, it would have been competent legal advice not to call them, and even if they had been called, their testimony would not have been sufficiently believable that their absence could be said to have deprived Petitioner of a fair trial." While conceding that petitioner was entitled to the effective assistance of counsel he concluded:
 
 
 42
 I do not believe that relief is warranted, however, because, as found above, Petitioner's ineffective assistance of counsel claim is without merit, he was not prejudiced and therefore this claim should also be denied.
 
 
 43
 Senior United States District Judge Ralph M. Freeman, with whom objections to the Magistrate's Report and Recommendations had been filed, again carefully reviewed the case and in a nine-page opinion denied the petition for a writ of habeas corpus. In doing so, Judge Freeman quickly disposed of petitioner's claim that his counsel had been deficient in failing to call petitioner to the stand, noting petitioner's prior criminal record and the weaknesses of the prosecution case at the time, weaknesses which could have led a reasonable counsel to conclude that it was safer to put the government to its proof than to risk the obvious dangers of exposing petitioner's own record. Anyone reading the testimony of the petitioner, particularly the testimony given before Judge Ravitz, would be led to believe that he would be far from an ideal witness in his own behalf. The same, Judge Freeman held, would have been true of Jackson-El who was also incarcerated and who, as noted by Magistrate Carlson, was also imprisoned at the time and was directly implicated in the murder through the testimony of Ms. Malone. He therefore found that "petitioner has not shown that trial counsel's conduct in not calling petitioner or Jackson-El to the stand was beyond the wide range of professionally competent assistance."
 
 
 44
 Turning finally to the failure to call alibi witnesses, Judge Freeman viewed this as a "potentially more serious allegation of ineffective assistance of counsel." Distinguishing other cited cases of ineffective assistance, Judge Freeman concluded:
 
 
 45
 There was no evidence tending to show that the trial attorney was aware of the fact that a previous attorney had withdrawn because of an inability to interview witnesses in Ohio. There is only conflicting evidence as to whether Petitioner actually told his trial attorney of the existence of alibi witnesses. Petitioner claims he told his attorney one time a few days before trial that there were people in Cleveland for the attorney to interview ... A review of the transcript makes it apparent that the timing of this revelation, if it indeed occurred, put the attorney in an awkward position because 1) it was made only a few days before trial and an attorney must file a notice of a defense of alibi at least 10 days before trial (Mich.comp. Laws, Sec. 768.20, 768.21) and 2) it was made during an altercation between the attorney and the client Petitioner concerning the attorney's need for a copy of the preliminary hearing transcript. Petitioner did not raise the issue of an alibi defense himself at trial although he was a vocal and assertive defendant. Also, the alleged alibi witnesses did not come forward and identify themselves although two of them attended the trial on at least one occasion. The trial attorney, on the other hand, testified that he does not remember whether he was told about alibi witnesses or not, but that if he had been told, his normal practice would have been to look into the matter ... Inasmuch as the testimony presented at the evidentiary hearing on 8-26-85 indicates conflicts about what occurred some 12 years earlier and raises questions about whether anything pertaining to an alibi was communicated to the attorney, the Court finds that Petitioner has failed to show that the conduct of his attorney was unreasonable. The Petitioner has not shown that his trial counsel's performance was deficient pursuant to the first prong of the Strickland test. Therefore, it is not necessary to discuss the second prong of whether counsel's performance prejudiced the defense by depriving Petitioner of a trial whose result is reliable.
 
 
 46
 I certainly agree with the majority that this is a difficult case in which there is room for disagreement, but I cannot conclude that petitioner has carried his heavy burden of showing his entitlement to the relief sought, especially after the passage of so much time and especially after his case has been scrutinized at so many levels. I am certainly not convinced that any failure of counsel, if constitutionally deficient, rendered the result of the trial unreliable within the meaning of Strickland. 466 U.S. at 687. Malone's testimony of the events preceding the death, although not corroborated by any witnesses, are nonetheless corroborated by the circumstances: she did in fact file a missing person's report and her testimony concerning petitioner's statements as to his disposal of the body conformed with the discovery made by the police shortly after the murder.
 
 
 47
 What to me is so totally unconvincing about Clark's claims, however, is the inconsistency in the conduct of the petitioner himself. By his own admission, he waited until the eve of trial before mentioning the existence of other witnesses. Even then, he did not mention that these witnesses would validate his alibi. The incredibility of his alibi defense is further punctuated by the fact that at least two of those witnesses, whom he years later called to testify, in fact attended his original trial on the murder charge. They could not have failed to recognize the importance of their testimony in exonerating him if his claim was true. Further, it staggers the imagination to believe that Clark, who was not unfamiliar with crime and plainly not bashful about speaking up, would have supinely sat by without clearly asserting his alibi, if in fact he had one. Is it any wonder that neither Magistrate Carlson nor Judge Ravitz, who actually heard the testimony of some of these witnesses, was able to credit this testimony?
 
 
 48
 I very well realize that not all of the fifteen-year delay in this case is the petitioner's fault. Much of it may be explained away, but not all: not Clark's failure to advise counsel of the existence of alibi witnesses until shortly before his trial (even assuming he did); not of the failure of two of the alibi witnesses to come forward or seek to assist Clark even though they had enough interest to attend the murder trial itself; not Clark's failure to assert formally his alibi defense until many years later. It must be remembered that Clark already possessed an extensive criminal record and was no stranger to the courts or criminal procedures. Anyone like Clark who had an alibi with merit and who was charged with first-degree murder, albeit one year after the crime, would have immediately and very vocally asserted the defense to anyone who would hear it. Clark didn't expressly do so until many years later. In short, I cannot find any more merit in his claims than could Judge Freeman, Magistrate Carlson, Judge Ravitz, or the Michigan courts. I would affirm.
 
 
 
 [1]
 Petitioner also claimed ineffective assistance of appellate counsel. Due to our resolution of the ineffective assistance of trial counsel claim, we need not address the claim regarding appellate counsel
 
 
 [2]
 Petitioner has apparently abandoned this claim on appeal